UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 13-10628

EXERGEN CORPORATION

v.

KAZ USA, INC.

MEMORANDUM AND ORDER ON CROSS-MOTIONS FOR
SUMMARY JUDGMENT ON KAZ'S LICENSE DEFENSE

July 24, 2015

STEARNS, D.J.

In this intellectual property suit, plaintiff Exergen Corporation accuses defendant Kaz USA, Inc., of infringing U.S. Patent Nos. 6,292,685 (the '685 patent) and 7,787,938 (the '938 patent). Kaz asserts as a defense, *inter alia*, that it is a licensee for the two patents-in-suit as the result of a 1993 patent license agreement entered between Exergen and Thermoscan, Inc. Kaz claims to be the successor-in-interest to Thermoscan's temperature measuring business. The parties have filed cross-motions for summary judgment on the license defense.[1]

---

[1] Kaz has also filed motions for summary judgment on non-infringement, lack of willful infringement, and invalidity because of obviousness. Exergen has also filed a motion for summary judgment on the issue of inequitable conduct.

## BACKGROUND

The August 12, 1993, license agreement was part of a settlement of a lawsuit brought by Exergen against Thermoscan, alleging infringement of U.S. Patent No. 5,199,436. At the time of the agreement, Thermoscan manufactured and sold ear thermometers that used pyroelectric infrared sensors as transducers, while Exergen manufactured and sold ear thermometers made with thermopile transducers. The agreement, which is attached as exhibit D to the Scruggs declaration and exhibit HHH to the Underwood declaration, "grant[ed] to Thermoscan a non-exclusive license to make, use, sell and to have made all goods, and to practice all methods covered by each and every Licensed Patent in the Licensed Field." Thermoscan Agreement Art. II. Licensed Patents included

> (i) any United States or foreign patent now owned by Exergen or which Exergen now has the power to license or under which Exergen now has the ability to direct or compel license; (ii) any patent which issues on an application which is now pending in the United States Patent and Trademark Office or any foreign patent office or which is filed on an invention made prior to the date of this Agreement now owned by Exergen or which Exergen now has the power to license or under which Exergen now has the ability to direct or compel license; or (iii) which issues on any continuation or division thereof or reissue or reexamination of any such patent.

*Id.* Art. I.A. The Licensed Field was defined as "the field of electronic or electromechanical instruments for measuring any temperature

characterizing a living person or animal employing any transducer whatever, except for instruments employing an Excepted Transducer." *Id.* Art. I.C.  The parties agree that the Excepted Transducers are essentially thermopiles.  *See id.* Art. I.B.  Kaz's accused thermometers – the Vicks Forehead Thermometer V977 and the Braun Forehead Thermometer FHT-1000 – both use thermopiles as transducers.

Although the license agreement excluded thermometers that employed thermopile transducers, these could be brought within the grant scope, "[i]f the relative economic or technical attractiveness of Excepted Transducers materially changes from circumstances existent at the time of execution of this Agreement such that it is no longer practicable for Thermoscan to market a product without an Excepted Transducer." *Id.* Art. VII.H.  Under those circumstances,

> the restriction in the license of Article II from using an Ex[c]epted Transducer shall not apply to Exergen's ambient compensation invention, claimed in claims 1-5 of said U.S. Letters Patent No. 5,199,436, claims 7-8 of U.S. Letters Patent No. 5,012,813, and claim 23 of U.S. Letters Patent No 4,993,419, and any claims of corresponding scope in any foreign counterparts, continuations, divisions, reissues, or reexaminations thereof.

*Id.*

The license agreement was not "assignable or transferable by Thermoscan to a third party without the written consent of Exergen except

3

assignments . . . to the legal successor to Thermoscan's entire temperature measuring instruments business as a going concern." *Id.* Art. VII.I. In 1995, Gillette Corporation purchased Thermoscan, which was merged into a company called Gillette Thermometer, Inc. After the merger, Gillette Thermometer assumed the name Thermoscan, Inc. In December of 2006, Kaz acquired Thermoscan's intellectual property as a part of a stock and assets purchase from Braun GmbH, Gillette Home Diagnostics, Inc., and Braun Oral-B Ireland Ltd. In 2008, Kaz purchased all outstanding stock and merged with Thermoscan.

## DISCUSSION

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A 'genuine' issue is one that could be resolved in favor of either party, and a 'material fact' is one that has the potential of affecting the outcome of the case." *Calero-Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 19 (1st Cir. 2004), citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-250 (1986). The moving party bears the burden of establishing that there is no genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986). "The evidence of the

non-movant is to be believed, and all justifiable inference are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

A license, whether express or implied, is a defense to a claim of patent infringement. *See Carborundum Co. v. Molten Metal Equip. Innovations, Inc.*, 72 F.3d 872, 878 (Fed. Cir. 1995). The alleged infringer has the burden of establishing this affirmative defense. *Id.* The interpretation of a license agreement, like all other contracts, is a question of the law for the court. *See Eigerman v. Putnam Invs., Inc.*, 450 Mass. 281, 287 (2007).[2]

To assert a valid defense of license to Exergen's claims, Kaz must clear three hurdles. First, Kaz must prove that it was assigned the license as "the legal successor to Thermoscan's entire temperature measuring instruments business as a going concern." Thermoscan Agreement Art. VII.I. Second, Kaz must demonstrate that the two patents-in-suit fall within the definition of a Licensed Patent because they cover "an invention made prior to the date of th[e] Agreement [then] owned by Exergen" despite having been issued from an original patent application filed five years after the date of the Thermoscan agreement. *Id.* Art. I.A. Finally, Kaz must

---

[2] The parties agree that to the extent that legal doctrines beyond general contract law are required to interpret its terms, Massachusetts law governs the Thermoscan license.

establish that its accused thermometers, which utilize thermopiles, fall within the Licensed Field because "the relative economic or technical attractiveness of Excepted Transducers [had] materially change[d] from circumstances existent at the time of execution of th[e] Agreement such that it [was] no longer practicable for Thermoscan to market a product without an Excepted Transducer." *Id.* Art. VII.H.

Exergen contends, and the court agrees, that Kaz's evidence falters at least with respect to the Licensed Field requirement. Kaz relies on three documents to support its contention that economic and technical conditions have materially changed since 1993, as required by Article VII.H, thus bringing thermometers employing thermopiles within the License Field. The first document is a letter dated April 30, 2007, from Richard Katzman, then-CEO of Kaz, to Dr. Francesco Pompei, President and CEO of Exergen and the named inventor on the Exergen patents. In the April 30 letter, Katzman informed Dr. Pompei of Kaz's acquisition of the Braun/Gillette stock and assets, and noted that Kaz had become the successor and licensee under the Thermoscan Agreement by virtue of the acquisition. Katzman acknowledged the license's limitations with respect to thermopile devices, but asserted that the "restriction on 'Excepted Transducers' no longer applie[d]." Dkt. # 84-2 at 2. "In view of the fact that

6

thermopile sensors have become the de rigueur standard for IR thermometers, it is extremely impractical – perhaps virtually impossible – to manufacture a non-thermopile sensor IR thermometer."[3] *Id.*

The two additional documents are short declarations filed in support of Kaz's opposition to Exergen's motion. James Gorsich, the Medical Devices Engineering Technical Manager at Kaz, states in the relevant paragraphs that:

> 4. For at least the last 20 years, all infrared sensors except thermopiles have had significant technical and economic disadvantages such that it is thermopile-based sensors which have provided technically and economically feasible solutions for infrared thermometer applications.
>
> 5. With respect to use in consumer goods, Golay cells are especially brittle and require special calibration procedures that make them impractical, pyroelectric sensors are particularly susceptible to mechanical stress and vibration such that they are impractical, bolometers and active far-infrared sensors are economically impractical.
>
> 6. For at least the last 20 years in the consumer market, thermopile technology has been the technically and economically feasible method for measuring human body temperature via infrared radiation.

---

[3] It is worth noting that less than two weeks before, on April 18, 2007, Dr. Pompei had written to Katzman that Exergen had become aware of Kaz's manufacture of forehead thermometers, and advised Kaz of the existence of the '685 patent and related applications. On May 10, 2007, Dr. Pompei replied to Katzman that Exergen did not agree that Kaz met the requirements of the Thermoscan Agreement.

Dkt. # 187.  Wolfgan Schmidt, a Product Manager for Infrared Detection at Excelitas Technologies Gmbh & Co. KG. (a supplier for Kaz), states in the relevant paragraphs of his declaration that:

> 5. In the 1990s, pyroelectric sensors and thermopiles were employed to measure IR radiation at that time.
>
> 6. However, use of pyroelectric sensors is difficult since these sensors only react to a differential change in heat and not to absolute heat flow, and therefore need a mechanical chopper to alternately have the sensor view a reference target and then the target of interest to thereby create a differential heat change.
>
> 7. When silicon-based thermopiles became available in the 1990s, they replaced pyroelectric sensors in industry because thermopiles measure steady heat flow and can easily be made using standard (CMOS) technology in existing wafer fabrication.
>
> 8. The main advantages of thermopiles over the other available IR sensing technologies are operational stability over extended environmental exposures (e.g., their calibration remains valid over many years), delivery of the required accuracy under real world conditions (e.g., thermopiles are stable against environmental thermal surges), and ease of application (e.g., thermopiles are the most economical solution to date).
>
> 9. Since their introduction, IR sensing technologies have been under constant evaluation for use in high volume production for high accuracy body- or ear-thermometry. Only thermopiles fulfill the necessary requirements for its employment in this task.
>
> 10. As of today and at least for the last 15-20 years, thermopile technology is the commercial and technically viable technology for accurate and long-term stable body- or ear-thermometry.

Dkt. # 186.

The statements contained in these documents are not admissible for their intended purpose. Under Fed. R. Evid. 701(c), a witness who is not testifying as an expert may not give opinion evidence "based on scientific, technical, or other specialized knowledge." The condition of Article VII.H – that "the relative economic or technical attractiveness of Excepted Transducers [had] materially change[d] from circumstances existent at the time of execution of th[e] Agreement such that it [was] no longer practicable for Thermoscan to market a product without an Excepted Transducer" is "a substantive matter[] beyond the ken of lay jurors," *In re Envtl. Careers Org., Inc.*, 597 Fed. App'x. 1, 2 (1st Cir. 2015) (quotation marks and citation omitted). Deciding whether the threshold condition has been met requires specialized knowledge to evaluate whether certain economic or technical changes are "material" and whether these changes have rendered it "impracticable" to use any transducer other than thermopiles in the manufacture of thermometers. None of the three Kaz witnesses were disclosed as expert witnesses in this case, and none have submitted the report required by Fed. R. Civ. P. 26.[4]

---

[4] Exergen notes that Kaz did not disclose Schmidt even as a fact witness. While Gorsich was identified as a fact witness, it was on other subject matter. Exergen further challenges the Katzman letter as

Kaz's evidence, were it admissible, would still be deficient.  None of the three witnesses identify a crucial change in circumstances between 1993 and a later relevant period that would have triggered the operation of Article VII.H.[5]  Although Gorsich and Schmidt both describe thermopiles as more technologically advantageous than other alternatives, there is no indication that these advantages were not already apparent at the time of the Thermoscan Agreement.  Because Kaz has failed to satisfy at least one of the three necessary conditions,[6,7] it cannot claim a license for the Patents-in-Suit.

---

inadmissible hearsay, that is, as an out-of-court unsworn and uncross-examined statement offered for the truth of the matter asserted.  *See* Fed. R. Evid. 801(c).

[5] The parties further dispute whether the operation of Article VII.H would extend to only the enumerated claims (Exergen's position), or to any then-existing or future claims covering the ambient compensation invention (Kaz's position).

[6] Kaz asserts that it is entitled to the benefit of the Thermoscan agreement because it merged with Thermoscan (via Gillette) and acquired Thermoscan's temperature measuring business as a "going concern."  Exergen disputes this because the 2006 stock and assets purchase excluded certain assets such as inventory at the time of closing, software, and physical plants.  Exergen further notes that although the sales included Thermoscan's intellectual property, the Exergen license was not identified as an assigned agreement, whereas other third-party license agreements were expressly assigned to Kaz.

[7] Kaz contends that the two patents-in-suit are Licensed Patents because they concern the same ambient compensation invention disclosed

ORDER

For the foregoing reasons, Kaz's motion for summary judgment on the license defense is <u>DENIED</u>.  Exergen's cross-motion is <u>ALLOWED</u>.

SO ORDERED.

/s/ Richard G. Stearns

_____
UNITED STATES DISTRICT JUDGE

---

by the earlier patents licensed under the Thermoscan Agreement.  Kaz notes that the patents-in-suit disclose nearly identical equations for computing ambient compensation, and that Dr. Pompei had conceived of using the same approach to measuring temperature at the forehead as early as 1991, as evidenced by his lab notebooks.  Kaz also makes much of the fact that Exergen, in the *Exergen v. Wal-mart* litigation, see *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312 (Fed. Cir. 2009), asserted claim 7 of United States Patent No. 5,012,813 (which was explicitly recited in Art. VII.H of the Thermoscan Agreement) against forehead thermometers similar to the accused products.  Exergen counters these arguments by marshalling evidence to show that although Dr. Pompei conceived of the idea, he did not believe that the forehead would be an effective location for temperature measurement until some years after the Thermoscan Agreement, when he discovered that the relatively constant flow property of the temporal artery made it a suitable site for reliable temperature measurement.  Exergen also makes the more general counterargument that the fact that a product may be covered by an earlier and a later patent is not evidence that the patents disclose the same invention.  Rather, later inventions build upon the foundation of earlier inventions, and a product may embody the innovations of multiple patents.