UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 13-10628-RGS

EXERGEN CORPORATION

v.

KAZ USA, INC.

MEMORANDUM AND ORDER ON KAZ'S MOTION
FOR SUMMARY JUDGMENT ON ISSUE PRECLUSION

December 7, 2015

STEARNS, D.J.

Defendant Kaz USA, Inc.'s fifth in a series of motions for summary judgment presents the significant and interesting question of just how different "unadjudicated patent claims and adjudicated patent claims [have to be to] materially alter the question of invalidity" under principles of issue preclusion; here the adjudicated claims were held invalid as attempting to capture a patent-ineligible law of nature. *Ohio Willow Wood Co. v. Alps S., LLC*, 735 F.3d 1333, 1342 (Fed. Cir. 2013); *see also* 35 U.S.C. § 101. A brief background explanation is necessary to set the scene. Plaintiff Exergen Corporation manufactures and sells forehead scanning thermometers. In 2012 and 2013, Exergen brought three separate lawsuits to enforce U.S. Patents Nos. 6,292,685 (the '685 patent) and 7,787,923 (the '923 patent)

against several competitors.   The lawsuit against Kaz was assigned (by a randomized algorithm) to this session of the court.   A companion case against Brooklands Inc. (No. 12-12243) was assigned to Judge Woodlock. The third lawsuit against Thermomedics, Inc., and Sanomedics International Holdings, Inc. (collectively Thermomedics) (No. 13-11243) was assigned to Judge Casper.[1]

On May 26, 2015, pursuant to an omnibus scheduling order, Kaz filed four summary judgment motions, but did not raise the issue of § 101 patentability.[2]   On August 28, 2015, Judge Woodlock agreed with Brooklands that claims 51 and 54 of the '938 patent were invalid as being directed to a patent-ineligible law of nature.   *Exergen v. Brooklands Inc.*,

---

[1] By agreement of the parties and the judges involved, claim construction proceedings in the three cases were consolidated in this session. All other matters were resolved by the individual sessions.

[2] Kaz sought rulings of no liability on grounds of license, no infringement, no willful infringement, and obviousness.  *See* Dkt. #s 140, 141, 142, 143.   This court allowed Kaz's motion for judgment of no willful infringement, but denied the remaining grounds.  *See* Dkt. #s 230, 251, 253. Exergen also filed two dispositive motions seeking to strike Kaz's license defense, and for judgment of no inequitable conduct.  *See* Dkt. #s 135, 137. These motions the court allowed.  *See* Dkt. #s 230, 246.   On September 3, 2015, the court set a trial date of January 11, 2016.

2015 WL 5096464, at *3-7 (D. Mass. Aug. 28, 2015).[3, 4]  On September 15, 2015, Judge Casper allowed a similar motion by Thermomedics, finding claims 51, 52, 54, and 55 of the '938 patent to be patent-ineligible.  *See Exergen v. Thermomedics, Inc.*, 2015 WL 5579800 (D. Mass. Sept. 15, 2015).  Final judgment was entered in *Thermomedics* the following day.  On October 13, 2015, with leave of court, Kaz submitted this fifth summary judgment motion asserting that the *Thermomedics* judgment has preclusive effect.

## DISCUSSION

"[I]issue preclusion [] prevents a party from relitigating issues that have been previously adjudicated.  The doctrine serves the twin goals of protecting litigants from the burden of relitigating an identical issue and promoting judicial economy by preventing needless litigation."  *Rodriguez-Garcia v. Miranda-Marin*, 610 F.3d 756, 770 (1st Cir. 2010) (internal quotation marks and citations omitted).  In a patent infringement case, "the law of the regional circuit [determines] the general procedural question of whether issue preclusion applies.  [The Federal Circuit]'s precedent [by contrast governs] questions involving substantive issues of patent law."

---

[3] In the same opinion, Judge Woodlock denied Brooklands' motion as to invalidity based on anticipation or obviousness.  *Id.* at *7-12.

[4] Brooklands' counterclaims of inequitable conduct and for an exceptional case finding remain pending.

*Soverain Software LLC v. Victoria's Secret Direct Brand Mgmt., LLC*, 778 F.3d 1311, 1314 (Fed. Cir. 2015).

> In the First Circuit, issue preclusion
>
> may be applied where (1) the issue sought to be precluded in the later action is the same as that involved in the earlier action; (2) the issue was actually litigated; (3) the issue was determined by a valid and binding final judgment; and (4) the determination of the issue was essential to the judgment.

*Rodriguez-Garcia*, 610 F.3d at 770 (internal quotation marks and citation omitted).  A further requirement is that the party against whom preclusion is asserted "has had a full and fair opportunity for judicial resolution of the same issue." *Id.* at 771 (citation omitted).  Under Federal Circuit precedent, "[c]omplete identity of claims is not required to satisfy the identity-of-issues requirement for claim preclusion."  *Soverain Software*, 778 F.3d at 1319.  "Rather, it is the identity of the *issues* that were litigated that determines whether collateral estoppel should apply."  *Ohio Willow Wood Co.*, 735 F.3d at 1342 (emphasis in original).  Claim preclusion applies "[i]f the differences between the unadjudicated patent claims and adjudicated patent claims do not materially alter the question of invalidity."  *Id.*

4

Exergen concedes that the *Thermomedics* judgment meets the procedural requirements of claim preclusion.[5]   It contests vigorously, however, that the differences between the 16 unadjudicated claims asserted against Kaz and the adjudicated claims "do not materially alter the question of validity" under § 101.[6]

Section 101 provides that "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title."   Although the scope of patentable subject matter is "expansive," laws of nature, physical phenomena, and abstract ideas have long been held to be patent-ineligible.   *Diamond v. Chakrabarty*, 447 U.S. 303, 308-309 (1980).

---

[5] Exergen contends that the lack of a formal final judgment in *Brooklands* (Exergen's motion for entry of final judgment remains pending) forestalls the preclusive effects of Judge Woodlock's decision.  Kaz, for its part, asserts that a decision need only be "adequately deliberated and firm" to be accorded preclusive effect.  *Dana v. E.S. Originals, Inc.*, 342 F.3d 1320, 1323 (Fed. Cir. 2003).   *Dana* applied Eleventh Circuit procedural rules, which do not explicitly require "a valid and binding final judgment," as does the First Circuit.  *See id.*, citing *Christo v. Padgett*, 223 F.3d 1324, 1339 (11th Cir. 2000).  Ultimately, the dispute is of no practical consequence.  The two claims invalidated in *Brooklands* were also invalidated in *Thermomedics*.  It is, however, significant that Judge Casper found Judge Woodlock's reasoning persuasive in reaching her decision.  *See Thermomedics*, 2015 WL 5579800, at *6.

[6] Only claim 54 of the '938 patent was asserted in both the Kaz and Thermomedics actions.

> [A] new mineral discovered in the earth or a new plant found in the wild is not patentable subject matter.  Likewise, Einstein could not patent his celebrated law that E=mc²; nor could Newton have patented the law of gravity.  Such discoveries are "manifestations of . . . nature, free to all men and reserved exclusively to none."

*Id.* at 309 (citation omitted).

In recent opinions addressing § 101 patentability, the Supreme Court has made clear that the "machine or transformation" test propounded by the Federal Circuit,[7] although a "useful and important clue," is not the exclusive test for patent eligibility.  *Bilski v. Kappos*, 561 U.S. 593, 604 (2010).  Rather, the Court outlined a two-step query to be used in analyzing subject matter eligibility.

> First, we determine whether the claims at issue are directed to one of those patent-ineligible concepts. [*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,] 132 S. Ct. 1289[,] 1296-1297 [(2012)].  If so, we then ask, "[w]hat else is there in the claims before us?" *Id.,* [] 132 S. Ct., at 1297.  To answer that question, we consider the elements of each claim both individually and "as an ordered combination" to determine whether the additional elements "transform the nature of the claim" into a patent-eligible application. *Id.,* [] 132 S. Ct., at 1298, 1297.  We have described step two of this analysis as a search for an "'inventive concept'"— *i.e.,* an element or combination of elements that is

---

[7] Under the "machine or transformation" test, "a[ patent] applicant may show that a process claim satisfies § 101 either by showing that his claim is tied to a particular machine, or by showing that his claim transforms an article." *In re Bilski*, 545 F.3d 943, 961 (Fed. Cir. 2008), *aff'd, but criticized sub nom. Bilski v. Kappos*, 561 U.S. 593 (2010).

"sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself."  *Id.*, [] 132 S. Ct. at 1294.

*Alice Corp. Pty. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2355 (2014).

As described in previous summary judgment iterations, the '685 and '938 patents are both entitled "Temporal Artery Temperature Detector" and claim methods and apparatuses for measuring human body temperature by detecting the temperature at the forehead covering the temporal artery and computing the internal body temperature using an arterial heat balance approach.  The patents disclose (but do not claim) the mathematical relationship of heat flow from the body's core temperature to surface skin temperature allowing for the ambient temperature.

Claims 51 and 54 of the '938 patent are both independent method claims consisting of a "measuring" and a "processing" step.

> 51. A method of detecting human body temperature comprising:
>
>> measuring temperature of a region of skin of the forehead; and
>>
>> processing the measured temperature to provide a body temperature approximation based on heat flow from an internal body temperature to ambient temperature.
>
> 54. A method of detecting human body temperature comprising:

> measuring radiation as target skin surface of the forehead is viewed, and
>
> processing the measured radiation to provide a body temperature approximation based on heat flow from an internal body temperature to ambient temperature.

Claims and 52 and 55 depend respectively on claims 51 and 54, and recite a further limitation "wherein the region of the skin is over an artery."

Applying the *Mayo* framework, Judge Casper in *Thermomedics* answered the first query in the affirmative.

> The parties do not seriously dispute that the four claims at issue are directed to patent-ineligible concepts. . . . Claims 51 and 54 and their related dependent claims are directed to applying mathematical models of natural thermodynamic relationships, so the § 101 analysis proceeds to the second step.

*Thermomedics*, 2015 WL 5579800, at *4.

At the second phase of the analysis, Judge Casper examined and found no innovation in the individual steps of the claims.

> [T]he independent claims break down into processing and measuring elements. The processing elements recite a method for converting a temperature or radiation reading to a body temperature estimate based on "heat flow from an internal body temperature to ambient temperature." [] These elements simply describe the application of a heat flow model, which is itself a natural phenomenon akin in *Mayo* to the natural biological relationship between concentrations of metabolites in the blood and the necessary drug dosage. The *Mayo* Court held that these elements do not contribute to patentability because these clauses simply "tell the relevant audience about the laws" of nature. *Mayo,* 132 S. Ct. at 1297.

> The measuring elements recite the measurement of temperature or radiation at a region of skin of the forehead. [] The measuring elements include no limit on how temperature or radiation is to be determined, leaving only the measurement of a naturally-occurring phenomenon at a particular location on the body. These elements parallel the "determining" elements in the *Mayo* patent claims that directed the doctor to determine the level of a certain chemical in the subject.  [*Mayo*], 132 S. Ct. at 1295.  The *Mayo* Court found no inventive concept in these elements because they "simply tell doctors to engage in well-understood, routine, conventional activity previously engaged in by scientists in the field."  *Id.* at 1298.

*Thermomedics*, 2015 WL 5579800, at *5.  Although the combination of the steps presented a "closer question," Judge Casper found that the combination similarly "lacked an inventive concept outside of the laws of nature."  *Id.*, at *5-6.

> Exergen may well be correct that Dr. Pompei's discovery that surface skin measurements taken at the forehead reliably can be converted to accurate body temperature is novel and valuable.  However, the additional step of measuring the surface skin of the forehead is a necessary, conventional step involving collecting the data needed to be plugged into the mathematical equations in the processing step.  Measuring temperature or radiation is simply not an inventive or unconventional step in the field of thermometry.

*Id.*, at *6, quoting *Brooklands*, 2015 WL 5096464, at *6.  Judge Casper thus concluded that "[n]o matter how novel the concept of measuring body temperature from forehead skin temperature or how valuable the contribution to the medical community, this idea as set forth in the asserted claims is fundamentally a discovery of a natural relationship between skin

9

temperature and body temperature."[8]  *Thermomedics*, 2015 WL 5579800, at *6.

In its reply brief, Kaz makes a sweeping argument that the *Thermomedics* decision invalidates all of the claims of the '685 and '923 patents.  In pushing this argument, Kaz relies on the rule regulating patent prosecution that permits a patent application to claim only one "independent and distinct" invention.  37 C.F.R. § 1.141.  Because *Thermomedics* held the invention of the patents-in-suit to be patent-ineligible, it follows, according to Kaz, that none of the claims of the patents are viable because they are all directed to the same unpatentable subject matter.

Exergen counters, and this court agrees, that Kaz's argument amounts to an impermissible bypass of the required claim-by-claim analysis.  Kaz cites no authority for the proposition that rules of prosecution have any effect on a judicial determination of validity.  *Cf. Shelcore, Inc. v. Durham Indus., Inc.*, 745 F.2d 621, 624 (Fed. Cir. 1984) (the prosecution rule that where not separately argued, the validity of a dependent claim stands or falls with the

---

[8] Judge Caper also determined that the "machine or transformation" test did not alter the analysis because "the claims simply apply a mathematical formula to temperature or radiation measurements and do not change the measurements 'into a different state or thing.'"  *Thermomedics*, 2015 WL 5579800, at *6 (citation omitted).

independent claim "has no application in a district court proceeding"). Moreover, Kaz's position runs counter to the codified presumption that "[e]ach claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims."  35 U.S.C. § 282(a).  Consistent with this settled understanding, courts have simultaneously invalidated and upheld different claims of the same patent under § 101.  *See*, *e.g.*, *Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 133 S. Ct. 2107 (2013).

With these precepts in mind, I turn now to an individual examination of the 16 unadjudicated claims that are at issue.

*Claim 56 of the '938 Patent*

Claim 56 depends on claim 54, but with the added limitation "wherein the region of the skin is over a temporal artery."  In holding in *Thermomedics* that dependent claims 52 and 55 were not patent-eligible, Judge Casper noted that the additional limitation ("the region of the skin is over an artery") added only the element of "an artery [which] is a natural element and does not add an inventive concept."  *Thermomedics*, 2015 WL 5579800, at *6. The further narrowing of claim 56 to a specific artery does not materially detract from this analysis.

11

*Claims 27, 29, and 37 of the '938 Patent*

Claims 27, 29, and 37 all depend on claim 26.

> 26. A method of detecting human body temperature comprising, with a radiation detector, measuring radiation as target skin surface over an artery is viewed, the artery having a relatively constant blood flow, and electronically determining a body temperature approximation, distinct from skin surface temperature, from the radiation detector as the target skin surface over the artery is viewed.

Claim 27 adds the limitation "wherein the body temperature approximation corresponds to an oral measurement." Claim 29 adds the limitation "determining the body temperature approximation based on ambient temperature to which the human body is exposed." Claim 37 adds the limitation "wherein the artery is a temporal artery."

The court agrees with Kaz that claims 27, 29, and 37 are not patentably distinct from claims 51 and 54 under the *Thermomedics* analysis. With respect to the first step of *Mayo*, Exergen contends that the claims do not expressly recite the heat flow model and do not therefore implicate a law of nature. The problem with Exergen's argument is that the patents disclose no other technique for determining a body temperature approximation. As Kaz points out, Exergen's arguments to the patent examiner during prosecution implicitly relied on an arterial heat flow model. *See* March 17, 2010 Amendment, Dkt. # 185-9. The additional specifications – "the artery having

a relatively constant blood flow," "the body temperature approximation corresponds to an oral measurement," "determining the body temperature approximation based on ambient temperature to which the human body is exposed," and "wherein the artery is a temporal artery" – are also directed to patent-ineligible natural phenomena (the blood flow of an artery, or the temporal artery), or facets of the thermodynamic relationship (the correlation between deep body temperature, ambient temperature, and an oral temperature approximation).

At the second step of *Mayo*, a court is to ask: "[w]hat else is there in the claims before us?" *Mayo*, 132 S. Ct. at 1297. Like claims 51 and 54, claims 27, 29, and 37 require measuring and processing/determining steps. Claims 27, 29, and 37 limit the measuring step to the use of a radiation detector, and the determining step to the use of electronics. However, the recitation of a generic piece of equipment does not materially alter the validity analysis. *See DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1256 (Fed. Cir. 2014) ("[A]after *Alice,* there can remain no doubt: recitation of generic computer limitations does not make an otherwise ineligible claim patent-eligible. The bare fact that a computer exists in the physical rather than purely conceptual realm 'is beside the point.'") (citations omitted). Thus, the combination of

the elements in claims 27, 29, and 37 offer no additional inventive aspect to what was disclosed in claims 51 and 54.

*Claims 17 and 24 of the '938 Patent*

Claims 17 and 24 both depend on claim 14.

> 14. A method of detecting human body temperature comprising making at least three radiation readings per second while moving a radiation detector to scan across a region of skin over an artery to electronically determine a body temperature approximation, distinct from skin surface temperature.

Claim 17 adds the limitation "determining the body temperature approximation based on ambient temperature to which the human body is exposed." Claim 24 adds the limitation "wherein the artery is a temporal artery."

The most significant difference between claim 14 and claims 51 and 54 is that rather than claiming a generic measuring step, claim 14 explicitly requires "making at least three radiation readings per second while moving the radiation detector." Kaz contends that because this specific measuring procedure is practiced by Exergen's own prior art devices, inclusion of this step adds nothing of patentable significance.

The court disagrees. It is important to differentiate an analysis under § 101 (patentability) from one under § 103 (obviousness). It is true that the Supreme Court has held that "well-understood, routine, conventional

activity previously engaged in by scientists who work in the field . . . is normally not sufficient to transform an unpatentable law of nature into a patent-eligible application of such a law." *Mayo*, 132 S. Ct. at 1298. However, it does not follow that the inclusion of any previously known element in a claim necessarily defeats subject matter eligibility. If that were so, then obviousness under § 103 would always default to ineligibility under § 101. This would be contrary to Supreme Court precedent. "[A] new combination of steps in a process may be patentable even though all the constituents of the combination were well known and in common use before the combination was made." *Diamond v. Diehr*, 450 U.S. 175, 188 (1981).

Likewise, "a process is not unpatentable simply because it contains a law of nature or a mathematical algorithm," *id.* at 187, as "all inventions at some level embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas." *Mayo*, 132 S. Ct. at 1293. In *Diehr*, the Supreme Court examined the patent eligibility of a rubber molding and curing process that

> consisted in effect of the steps of: (1) continuously monitoring the temperature on the inside of the mold, (2) feeding the resulting numbers into a computer, which would use the Arrhenius equation to continuously recalculate the mold-opening time, and (3) configuring the computer so that at the appropriate moment it would signal "a device" to open the press.

15

*Id.* at 1298, citing *Diehr*, 450 U.S. at 177-179.   Although the process incorporated a well-known mathematical equation, it was nonetheless patentable because of "the way the additional steps of the process integrated the equation into the process as a whole."  *Mayo*, 132 S. Ct. at 1298.  As the Court pointed out, the claims at issue "do not seek to pre-empt the use of that equation.  Rather, they seek only to foreclose from others the use of that equation in conjunction with all of the other steps in their claimed process." *Diehr*, 450 U.S. at 187.

By way of contrast, in *Parker v. Flook*, 437 U.S. 584 (1978), the Court held that a method for adjusting alarm limits during the catalytic conversion of hydrocarbons was not patent-eligible because the claim did nothing more than "provide[] a formula for computing an updated alarm limit."  *Id.* at 586.

> The only difference between the conventional methods of changing alarm limits and that described in respondent's application rests in the second step – the mathematical algorithm or formula. . . . The patent application does not purport to explain how to select the appropriate margin of safety, the weighting factor, or any of the other variables.

*Id.* at 585-586.

Judge Casper's analysis of the measuring step in claims 52 and 54 echoes the language in *Flook*: "The measuring elements include no limit on how temperature or radiation is to be determined, leaving only the measurement of a naturally-occurring phenomenon at a particular location

16

on the body." *Thermomedics*, 2015 WL 5579800, at *5.   Thus, the invalidated claims amounted to no more than a recitation of the thermodynamic relationship "while adding the words 'apply it.'" *Mayo*, 132 S. Ct. at 1294.

This analysis, however, does not hold true when it comes to the specific measuring instructions of claims 17 and 24.   Although measuring temperature or radiation is a fundamental technique in the field of thermometry, innovations on basic practices merit patent protection. (Indeed, that is an essential premise of the patent laws.)  Kaz has not shown that the specific manner of measuring claimed is so common as to be routine or conventional.   Nor has Kaz shown that the specific combination of the disclosed measuring and determining steps were known in the prior art.[9]  In the absence of such showings, the court cannot conclude that claims 17 and 24 are patentably indistinct from patents 51 and 54 under a § 101 analysis.

*Claim 33 of the '938 Patent*

Claim 33 depends on claim 26 (recited above), but adds the limitation "moving the radiation detector to scan the region of the skin over the artery." Unlike claims 27, 29, and 37, the additional limitation of claim 33 is not

---

[9] The question of obviousness, as the court previously held, remains a matter for the jury.

directed to a natural phenomenon or law of nature, but rather to the method of performing the measuring step. Kaz maintains that because "moving and scanning" is a well-known technique in the art, this limitation is not patentably significant.

This argument has heft. Kaz has shown that patents dating from more than 30 years ago disclosed the technique of scanning while moving a radiation detecting device. But it is unclear whether this technique has become so prevalent as to be routine or conventional. The court notes that the accused devices in *Thermomedics* and *Brooklands* (as Exergen points out), do not require scanning while moving. While the question is a close one, in light of Kaz's elevated burden of producing clear and convincing evidence of patent invalidity, the court cannot say that the additional limitation does not "materially alter the question of invalidity."

*Claims 60 and 66 of the '938 Patent*

Claims 60 and 66 both depend on claim 57.

> 57. A method of detecting human body temperature comprising:
>
>> moving a temperature detector to scan across skin of a region of a forehead; and
>>
>> providing a body temperature approximation from a peak temperature reading from plural readings taken from plural locations during the scan.

Claim 60 adds the limitation "further comprising providing a body temperature approximation based on ambient temperature to which the human body is exposed and the peak temperature reading."  Claim 66 adds the limitation "[w]herein the scan is over a temporal artery."  Like claims 17 and 24 discussed above, and unlike claims 51 and 54, claims 60 and 66 do not recite a generic measuring step, but rather specify moving while scanning, as well as taking plural readings from plural locations during the scan to determine a peak temperature.  As with claim 33, the court cannot say that claims 60 and 66 are patentably indistinct from patents 51 and 54.

*Claims 39, 40, 46, and 49 of the '938 Patent*

Claims 39, 40, 46, and 49 are device claims.

> 39. A body temperature detector comprising:
>
> a radiation detector;
>
> electronics that measure radiation from at least three readings per second of the radiation detector as target skin surface over an artery is viewed and that process the detected radiation to provide a body temperature approximation based on heat flow from an internal body temperature to ambient.

Claims 40 and 46 depend on claim 39.  Claim 40 adds the limitation "wherein the body temperature corresponds to an oral measurement."  Claim 46 adds the limitation "wherein the artery is a temporal artery."

Claim 49 depends on claim 48.

48. A body temperature detector comprising:

a radiation detector; and

electronics that measure radiation from at least three
readings per second of the radiation detector as a target
skin surface over an artery is viewed, the artery having
a relatively constant blood flow, and that process the
measured radiation to provide a body temperature
approximation, distinct from skin surface temperature,
based on detected radiation.

Claim 49 adds the limitation "wherein the artery is a temporal artery."

These device claims require electronics that not only apply a law of
nature, but that are also capable of measuring radiation by taking at least
three readings per second. For the same reasons given in the analysis of
claims 17 and 24, the court cannot say that claims 39, 40, 46, and 49 are
patentably indistinct from patents 51 and 54.

*Claim 7 of the '685 patent*

Claim 7 depends on claim 4, which depends on claim 1.

1. A method of detecting human body temperature
comprising:

laterally scanning a temperature detector across a
forehead; and

providing a peak temperature reading from plural readings
during the step of scanning.

Claim 4 adds the limitation "computing an internal body temperature
as a function of ambient temperature and the peak temperature reading."

Claim 7 adds the further limitation "wherein the temperature detector comprises a radiation sensor which views a target surface area of the forehead." Like claim 17 and 24 of the '938 patent, and unlike claims 51 and 54, claim 7 of the '685 patent does not recite a generic measuring step, but requires moving while scanning (the court previously construed "laterally scan(ning)" as "moving a scanning device in a generally horizontal direction relative to the human body"), as well as taking plural readings during the scanning and calculating a peak temperature. Again, the court cannot say that claim 7 is patentably indistinct from patents 51 and 54.

*Claims 14 and 17 of the '685 Patent*

Claim 17 depends on claim 14.

> 14. A method of detecting human body temperature comprising:
>
>> detecting temperature at a forehead through a lateral scan across the temporal artery; and
>>
>> computing an internal body temperature of the body as a function of ambient temperature and sensed surface temperature.

Claim 17 adds the limitation "wherein the temperature detector comprises a radiation sensor which views a target surface area of the forehead."

Like claim 33 of the '938 patent, for purposes of a § 101 analysis, the only difference between claims 14 and 17 and the invalidated claims 51 and

54 is the "lateral scan" limitation.  As with claim 33, court cannot say that the additional limitation does not "materially alter the question of invalidity."

ORDER

For the foregoing reasons, Kaz's motion for summary judgment of issue preclusion is <u>ALLOWED IN PART</u> with respect to claims 27, 29, 37, and 56 of the '938 patent, and <u>DENIED IN PART</u> with respect to claims 17, 24, 33, 39, 40, 46, 49, 60, and 66 of the '938 patent, and claims 7, 14, and 17 of the '685 patent.  The jury trial will commence at 9 a.m., January 11, 2016, in Courtroom 21 of the Moakley Federal Courthouse, as previously scheduled.

SO ORDERED.

/s/ Richard G. Stearns

_____
UNITED STATES DISTRICT JUDGE