UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| EXERGEN CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 1:13-cv-10628-RGS |
| | ) | |
| v. | ) | **Leave to file excess pages granted** |
| | ) | **on May 5, 2016 [D.N. 422]** |
| KAZ USA, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## EXERGEN'S OPPOSITION TO
## KAZ'S MOTION FOR A NEW TRIAL

Kerry L. Timbers (BBO # 552293)
Robert M. Asher (BBO # 22865)
Joel R. Leeman (BBO # 292070)
Brandon T. Scruggs (BBO # 672541)
Sharona H. Sternberg (BBO # 682384)
SUNSTEIN KANN MURPHY & TIMBERS LLP
125 Summer Street
Boston, MA 02110-1618
(617)  443-9292
ktimbers@sunsteinlaw.com

*Attorneys for Plaintiff*
EXERGEN CORPORATION

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

I.     INTRODUCTION .................................................................................................. 1

II.    LEGAL STANDARDS FOR WEIGHING KAZ'S MOTION ......................................... 2

III.   ARGUMENT ....................................................................................................... 3

    A.    Exergen's Closing Argument Affords No Grounds for a New Trial ...................... 3

        1.    Kaz's reliance on opinions of counsel was open to fair comment ................................................................................. 4

        2.    Exergen never strayed from the Court's construction of "internal body temperature" ....................................................... 5

        3.    Counsel made appropriate comments about the construction of "peak" and "lateral scanning" ........................................... 9

        4.    Exergen made fair arguments about the doctrine of equivalents and inducement ................................................. 11

    B.    Kaz Makes an Absurd Effort to Pin Prejudicial Comments on the Court ............................................................................................. 13

        1.    The jury's understanding of indirect infringement could not have been impaired by a statement of the Court, which was corrected in writing ............................................................. 13

        2.    No conceivable harm resulted from the Court's comment upon admitting a poster into evidence ....................................... 18

    C.    The Plentiful Evidence of Non-Obviousness Argues Against a New Trial ............................................................................................. 19

    D.    Kaz Has No Grounds for a New Trial on Damages ........................................... 21

        1.    Exergen was not bound to apportion damages between the two asserted patents ............................................................. 22

        2.    Kaz is Wrong to Say the Award is Excessive ............................................. 23

        3.    Entire Market Value Rule (EMVR) Provides No Basis for Attack on the Award ................................................................ 25

      E.       Kaz's Remaining Reasons for a New Trial Must be Rejected.............................26

IV.      CONCLUSION............................................................................................................ 27

# TABLE OF AUTHORITIES

## Cases

*Aponte-Rivera v. DHL Solutions (USA), Inc.*, 650 F.3d 803 (1st Cir. 2011) .................................. 2

*Aqua Shield v. Inter Pool Cover Team*, 774 F.3d 766 (Fed. Cir. 2014) ....................................... 23

*Baron v. Suffolk County Sheriff's Dep't*, 402 F.3d 225 (1st Cir. 2005) ........................................ 16

*Brown & Williamson Tobacco Corp. v. Philip Morris Inc.*, 229 F.3d 1120 (Fed. Cir. 2000) ......................................................................................................................... 19

*C & F Packing Co. v. IBP, Inc.*, 224 F.3d 1296 (Fed.Cir.2000) ................................... 23

*Cal. Fed. Bank, FSB v. United States*, 245 F.3d 1342 (Fed.Cir.2001) ......................... 21

*Cambridge Plating Co., Inc. v. Napco, Inc.*, 85 F.3d 752 (1st Cir.1996) ................................ 1, 16

*Circuit Check Inc. v. QXQ Inc.*, 795 F.3d 1331 (Fed. Cir. 2015) ................................. 21

*Clausen v. Sea-3, Inc.*, 21 F.3d 1181 (1st Cir. 1994) ..................................................... 16

*Collins v. Ex-Cell-O Materials and Handling Co.*, 629 F. Supp. 540 (D. Mass. 1986) ......................................................................................................................... 17

*Colon-Millin v. Sears Roebuck de Puerto Rico, Inc.*, 455 F.3d 30 (1st Cir. 2006) ..................... 17

*Comcast IP Holdings I, LLC v. Sprint Commc'ns Co. L.P,* No. 12-CV-0205-RGA, 2015 WL 4730899 (D. Del. Aug. 10, 2015) ................................................................. 22

*Computer Sys. Eng'g, Inc. v. Qantel Corp.*, 740 F.2d 59 (1st Cir. 1984) ...................... 8

*Cool Light Co. v. GTE Prods. Corp.*, 832 F. Supp. 449 (D. Mass. 1993) ..................... 3

*Crowe v. Marchand*, 506 F.3d 13 (1st. Cir. 2007) ......................................................... 2

*Dall v. Coffin*, 970 F.2d 964 (1st. Cir. 1992) ................................................................. 2

*Diefenbach v. Sheridan Transp.*, 229 F.3d 27 (1st Cir. 2000) ..................................... 23

*Doherty v. Doherty Ins. Agency, Inc.*, 878 F.2d 546 (1st Cir. 1989) ........................... 18

*Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312 ............................................... 8

*Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197 (Fed. Cir. 2010) ................... 25

*Fonten Corp. v. Ocean Spray Cranberries, Inc.*, 469 F.3d 18 (1st Cir. 2006) ............... 9

*Granfield v. CSX Transp., Inc.,* 597 F.3d 474 (1st Cir. 2010) ........................................................ 1

*Havinga v. Crowley Towing and Transp. Co.,* 24 F.3d 1480 (1st Cir. 1994)................................ 22

*i4i Limited Partnership, Infrastructure for Information Inc. v. Microsoft Corp.,*
    598 F.3d 831 (Fed.Cir.2010) ................................................................................................ 23

*Koster v. Trans World Airlines, Inc.*, 181 F.3d 24 (1st Cir.) .................................................. 22, 23

*Leshore v. Cty. of Worcester,* 945 F.2d 471 (1st Cir. 1991) ........................................................ 19

*LifeNet Health v. LifeCell Corp.*, 2014 WL 5529679 (E.D. Va. 2014) ......................................... 5

*MacNeill Eng'g Co. v. Trisport, Ltd.*, 126 F. Supp. 2d 51 (D. Mass. 2001) ................................. 3

*Matton v. White Mt. Cable Constr. Corp.*, 190 F.R.D. 21 (D. Mass. 1999) ........................... 3, 12

*Mayo v. Schooner Capital Corp.*, 825 F.2d 566 (1st Cir. 1987)..................................................... 2

*Oiness v. Walgreen Co.,* 88 F.3d 1025 (Fed.Cir.1996)................................................................. 23

*Poulin v. Greer,* 18 F.3d 979 (1st Cir. 1994) ............................................................................... 3

*Puckett v. United States,* 556 U.S. 129 (2009)............................................................................. 9

*Quercia v. United States,* 289 U.S. 466 (1933) .......................................................................... 18

*Rodriguez v. Senor Frog's de la Isla, Inc.,* 642 F.3d 28 (1st Cir. 2011) ..................................... 12

*S.E.C. v. Happ,* 392 F.3d 12 (1st Cir. 2004) .............................................................................. 17

*Smith v. Kmart Corp.*, 177 F.3d 19 (1st Cir.1999)............................................................. 4, 22, 27

*Starski v. Kirzhnev*, 2011 U.S. Dist. LEXIS 26412 (D. Mass. Mar. 15, 2011) ............................. 3

*Ultratec, Inc. v. Sorenson Comm'ns, Inc.*, 2014 WL 4976596 (W.D. Wis. 2014) ....................... 5

*Unisplay, S.A. v. Am. Elec. Sign Co.,* 69 F.3d 512 (Fed. Cir. 1995)............................................. 21

*United States v. Ihenacho*, No. CRIM.A. 08-10337-RGS, 2012 WL 1301174 (D.
    Mass. Apr. 13, 2012), *aff'd,* 716 F.3d 266 (1st Cir. 2013)......................................................... 1

*Wagenman v. Adams,* 829 F.2d 196 (1st Cir. 1987) ................................................................... 23

*Wells Real Estate, Inc. v. Greater Lowell Board of Realtors*, 850 F.2d 803 (1st
    Cir. 1988)..................................................................................................................... 12, 26, 27

*Wildman v. Lerner Stores Corp.*, 771 F.2d 605 (1st Cir. 1985)................................................. 3, 9

*Wilson v. Bradlees of New England, Inc.,* 250 F.3d 10 (1st Cir. 2001) .......................................... 3

*Wilson v. Town of Mendon*, 294 F.3d 1 (1st Cir. 2002) ............................................................. 4, 8

**Statutes**

35 U.S.C. § 298 ........................................................................................................................ 4, 5

**Rules**

Fed. R. Civ. P. 51 ......................................................................................................................... 3

Fed. R. Civ. P. 61 ......................................................................................................................... 3

## I.    INTRODUCTION

Based on a handful of utterances by counsel and the Court that collectively occupy less than two pages of a trial transcript of 1,150 pages, Kaz asks for a new trial.  In none of these instances did Kaz mount an objection at trial.  This fact alone subjects Kaz's belated objections to review for "plain error," an exacting standard that Kaz cannot come close to satisfying.

The First Circuit says that "[p]lain error is a rare species in civil litigation, encompassing only those errors that reach the pinnacle of fault." *Granfield v. CSX Transp., Inc.,* 597 F.3d 474, 490-91 (1st Cir. 2010), citing *Cambridge Plating Co., Inc. v. Napco, Inc.,* 85 F.3d 752, 767 (1st Cir.1996). This Court cited with approval the First Circuit's view that such review is confined to "blockbuster" errors, not "ordinary backfires." *United States v. Ihenacho*, No. CRIM.A. 08-10337-RGS, 2012 WL 1301174, at *2 (D. Mass. Apr. 13, 2012), *aff'd,* 716 F.3d 266 (1st Cir. 2013).

These stringencies are designed to prevent a party from doing precisely what Kaz has done--waiting for the verdict before deciding to object.  After all, a timely objection at trial could have enabled the Court to cure in real time any genuine prejudice that Kaz might have pointed to.  As an institutional matter, the parties are obligated to do their part to ensure that the gigantic investment made by all participants in a trial—especially a jury trial—is not subject to a do-over based on errors that could have readily been corrected.

The Exergen statements targeted by Kaz's belated objections were made in closing argument.  These statements were in every respect proper, as will be explained.  Even if they were not, abundant law stands for the proposition that an instruction to the jury—just like the one this Court gave--that arguments by lawyers are not evidence will neutralize any harm caused by improper comments in a closing, even when the opposing party *does* make a timely objection.

Kaz's tardy objections to two remarks by the Court make for an equally feeble basis for a new trial. First, the Court's oral characterization of the law regarding indirect infringement was expressly set straight in a handwritten note that the Court sent to the jury along with a corrected instruction on this issue. Second, a benign comment that the Court made upon admitting a poster-board into evidence is twisted by Kaz into a prejudicial statement. No fair reading of the record can sustain this distortion. In any event, Kaz made no contemporaneous objection in either instance.

Kaz's bid for a new trial specifically on damages is essentially a grievance that the jury credited Exergen's calculations over Kaz's.  Here, too, Kaz has essentially waived its argument by its failure to object at trial to any of the testimony that it now revisits. Further, Kaz's damages expert embraced at trial some of the premises that Kaz now challenges.

## II.    LEGAL STANDARDS FOR WEIGHING KAZ'S MOTION

Even where a moving party has, unlike Kaz, preserved its grounds for a new trial by raising timely objections at trial, Rule 59(a) motions are "sparingly" granted.  *Dall v. Coffin*, 970 F.2d 964, 969 (1st. Cir. 1992). A trial court may overturn a jury verdict only if the verdict is "against the law," is "against the clear weight of the evidence," is "based upon evidence that is false," or is "tantamount to a miscarriage of justice."  *Crowe v. Marchand*, 506 F.3d 13, 19 (1st. Cir. 2007); *Mayo v. Schooner Capital Corp.*, 825 F.2d 566, 570 (1st Cir. 1987); *see also Aponte-Rivera v. DHL Solutions (USA), Inc.*, 650 F.3d 803, 812 (1st Cir. 2011) ("A new trial is warranted only if the verdict, though rationally based in the evidence, was so clearly against the weight of the evidence as to amount to a manifest miscarriage of justice.") (quotation marks omitted).

The moving party in a Rule 59(a) motion "bears the burden of 'show[ing] that th[e] court committed error and that the error rendered the trial unfair.'" *Starski v. Kirzhnev*, 2011 U.S. Dist.

LEXIS 26412, at *10 (D. Mass. Mar. 15, 2011) (quoting *MacNeill Eng'g Co. v. Trisport, Ltd.*, 126 F. Supp. 2d 51, 64 (D. Mass. 2001)); *see* Fed. R. Civ. P. 61 ("[A] court must disregard all errors and defects that do not affect any party's substantial rights.").

As stringent as these criteria are, Kaz faces a yet higher hurdle due to its failure to object at trial to any of the arguments or comments that underlie its motion. A Rule 59 motion should not be granted if the grounds for the motion were not called to the court's attention during trial. *Matton v. White Mt. Cable Constr. Corp.*, 190 F.R.D. 21, 23 (D. Mass. 1999) (failure to object ordinarily results in waiver of the issue as grounds for new trial); *Cool Light Co. v. GTE Prods. Corp.*, 832 F. Supp. 449, 459 (D. Mass. 1993) (party that does not promptly raise ground for new trial upon learning of it is precluded from raising the ground after trial); see, e.g., *Wildman v. Lerner Stores Corp.*, 771 F.2d 605, 609 (1st Cir. 1985)("Counsel cannot play a waiting game and after an adverse verdict is rendered raise an objection to argument for the first time."); *Wilson v. Bradlees of New England, Inc.,* 250 F.3d 10, 21 (1st Cir. 2001) ("It is settled law that a party who fails to lodge a proper objection to an omitted jury instruction waives the issue on appeal.") (citing Fed. R. Civ. P. 51 ("No party may assign as error the giving or failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict")); *Poulin v. Greer,* 18 F.3d 979, 982 (1st Cir. 1994) (counsel's failure to object to the omission of a requested jury instruction waived the issue on appeal).

## III.   ARGUMENT

### A.   Exergen's Closing Argument Affords No Grounds for a New Trial

Kaz devotes nearly half of its brief to combing through Exergen's closing argument for a peg on which to hang a new-trial request. The effort is unproductive.  For one thing, Exergen's statements at closing fell within the bounds of permissible argument.  Second, because Kaz did not object to these comments in a timely fashion, this Court's review is for plain error. *Smith v.*

*Kmart Corp.*, 177 F.3d 19, 25 (1st Cir.1999); see also *Wilson v. Town of Mendon*, 294 F.3d 1, 16 n.30 (1st Cir. 2002) (a party must typically voice such an objection at the conclusion of an opponent's closing argument).  Kaz concedes that it made no objection at the time to any portion of Exergen's closing argument. Brief at 1-2, 7 (acknowledging that Kaz's current objections are subject to plain-error review).

### 1.   Kaz's reliance on opinions of counsel was open to fair comment

Kaz complains that, in supposed violation of 35 U.S.C. § 298, Exergen noted that "Kaz failed to obtain a follow-up legal opinion after Exergen filed suit against it." Brief at 4. This misconstrues the evidence and the law.  Exergen's statement was aimed not at Kaz's failure to rely on opinions of counsel, the subject of § 298.  Instead, it fairly called into question Kaz's intent in claiming to rely on opinions of counsel where serious deficiencies in the opinions were known to Kaz.  Despite its knowledge of these problems, Exergen noted, Kaz never had those deficiencies addressed -- a key fact in determining Kaz's intent.  Indeed, the last of those opinions, from 2012, not only warned Kaz that the doctrine of equivalents was not addressed; it advised that "we would recommend a further review of such patents with respect to infringement under the doctrine of equivalents."  TX-69 at 2.  See also TT 9:29 (Kaz's closing argument in which it refers to the several opinions, including the 2012 opinion, in an effort to refute "willful blindness").

Exergen's closing reasonably questioned why Kaz did not follow the advice contained in the very opinion cited to demonstrate its good faith.  This is either classic evidence of a mindful omission to avoid learning of infringement, or an indication that Kaz knew it infringed and simply did not care.  The focus was not on the post-complaint failure to obtain another opinion, but on Kaz's failure to follow its attorney's advice to look into infringement under the doctrine

of equivalents, as well as Kaz's failure to correct glaring factual errors that Kaz knew were in the earlier opinions.

Exergen's argument does not run afoul of Section 298, because the evidence relates to opinions Kaz relied on at trial to show its good faith belief, not a failure to get opinions. *Ultratec, Inc. v. Sorenson Comm'ns, Inc.*, 2014 WL 4976596, *2 (W.D. Wis. 2014) ("the protection granted by 35 U.S.C. § 298 dissolves in the event defendants 'open the door' by attempting to refute a claim of willful infringement by implying that they relied on the advice of counsel"); *LifeNet Health v. LifeCell Corp.*, 2014 WL 5529679 (E.D. Va. 2014) (same, citing *Ultratec*). Here Kaz claimed to rely on opinions that it knew were deficient, and its failure to obtain opinions that addressed those problems is probative of Kaz's state of mind. It has nothing to do with Section 298, which addresses the lack of any opinions.

In addition, Section 298 is relevant only to willfulness (not at issue in the trial) and inducement; it says nothing about prohibiting reliance on the failure to obtain advice of counsel for purposes of finding contributory infringement. In light of this, Section 298 does not bar any reference to opinions or lack of opinions in connection with Kaz's state of mind with respect to contributory infringement, and thus has no bearing on the jury's determination that Kaz is liable for contributory infringement.

## 2. Exergen never strayed from the Court's construction of "internal body temperature"

Kaz misconstrues Exergen's statements and misleadingly compares this case to the *Wal-Mart* case, Brief at 8, to suggest that Exergen has played fast and loose with the meaning of "internal body temperature," when nothing could be further from the truth.

Throughout Dr. Collins's testimony, the jury was repeatedly reminded of the Court's construction of "internal body temperature," namely, the "temperature of a region of the body

existing beneath the sensed surface." See TT 6:59 ("'Internal body temperature' has been construed as the temperature underneath -- beneath the scanned surface"), 65 (same), 66 (same, discussed in detail), 7:6-10 (same, discussed in detail), 7:78 (same). The same is true for Dr. Bowman's testimony, see TT 8:161-63 (discussed in detail), and the parties' closing statements. TT 9:26 (Kaz closing: "region existing beneath the sensed surface"), 37-39 (Exergen closing: "somewhere beneath the surface of the skin"). This was of course confirmed by the Court in its jury instructions. TT 9:26. As laid out in Exergen's opposition to Kaz's motion for JMOL of noninfringement, plenty of evidence supported the jury's determination that Kaz's devices do in fact compute a temperature of a region of the body existing beneath the sensed surface. See TT 6:66, 7:6-10, 7:78.

At no time did Dr. Collins or any other witness testify that an actual "oral temperature" is an "internal body temperature." Instead, the testimony from Dr. Collins provided substantial evidence to support the jury's verdict that Kaz's devices add heat back in to the sensed surface temperature to provide an internal body temperature, namely, the region of the body beneath the skin over the temporal artery, and that Kaz labels this temperature an "oral equivalent." See TT 6:31 (tests showed devices "add temperature back in" in a manner "as would be expected by heat flow" as the "surface temperature loses heat to the environment"), 6:39 (What the device does is "exactly what heat flow would predict. It's using the heat flow method" to compensate for "heat leaving the body"), 6:59-60 (accused devices process "detected radiation, the surface radiation ... in a way which is consistent with what was described in the patent, how you do that heat balance or heat flow"); 6:56-57 ("It's adding temperature back in to the heat flow that's leaving" the body); 6:66 (heat "leaves through the skin out to the environment" and accused devices add "temperature back into the surface temperature"). Whether or not a specific equation -- or any

6

equation -- is used is irrelevant.

Kaz's devices measure temperature at the forehead surface, which is influenced by heat flow from the internal body temperature out to the environment. The displayed temperature is calculated from that skin temperature, and from ambient temperature, using heat flow to add temperature to the measured skin temperature to report the warmer temperature of the region beneath the skin surface over the temporal artery, taking into account the loss of heat from the temporal artery to the ambient environment through that region. The testimony and evidence presented at trial established that this reported internal body temperature is equivalent to an oral temperature in a manner sufficient for Kaz to label it an "oral equivalent."

This was properly explained in Exergen's closing statement. The sole portion of the closing that discussed "oral" or "oral equivalent" is this, reproduced in full:

> Kaz calls what it is reporting an oral equivalent temperature. But, as you know, because Mr. Yanney explained it so well, there's no blood flow, and everybody agrees there's no blood flow, between the oral cavity and the temporal artery. What's going on is there's a temperature gradient, a difference, right, from cooler to hotter. And what Kaz is doing is adding heat back in, just enough heat to get about one degree less than the heart. That's an oral equivalent, because somewhere between the scalp and the heart is one degree less than what's in the heart, somewhere beneath the surface of the skin beneath the surface of where you're measuring. And that also happens to be the same temperature as the oral equivalent. So that's what's going on, and that's why that limitation is met.

TT 9:38-39.

As explained in Exergen's opposition to Kaz's motion for JMOL on noninfringement, the evidence shows that Kaz uses the heat balance method to add heat back in along the path of heat flow from the heart to the environment. The number it ends up with is the temperature of the tissue below the skin surface, which also happens to be a number Kaz labels an "oral equivalent."

Kaz misconstrues the Wal-Mart case and on that basis argues that Exergen is being inconsistent. This case is not the Wal-Mart case, the evidence was not the same as in the Wal-

Mart case, and the patent claims were not the same as those in the Wal-Mart case.  In that case, the court determined that the accused device "measures infrared radiation from the patient's forehead to calculate and display a digital readout of the patient's *oral* temperature."  *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1321 (emphasis in original).  That is not the case here: The Kaz devices display an oral <u>equivalent</u>, which is another way of saying it displays a temperature that is like the oral temperature, but not the oral temperature itself.  TX-2 at 2 ("The unit reads an 'oral' *equivalent* temperature.  Add 1 F to get a rectal equivalent"); TX-3 at 5 ("oral *equivalent* temperature") (emphasis added).  In *Wal-Mart*, the phrase "indication of the internal temperature" was construed as something that is displayed to the user --"the number shown on the display must itself be the value of the internal temperature."  *Id*.  Because in *Wal-Mart* the accused thermometers did not display an internal body temperature, and an internal body temperature could be determined only through further calculation by the user, there was no infringement.  By contrast, Kaz displays a number that <u>is</u> the temperature beneath the sensed surface.  TT 6:66, TT 7:78.  The fact that this number is equivalent to an oral temperature such that Kaz labels it an "oral equivalent" cannot obscure the fact that Kaz's devices determine an internal body temperature.

What is more, Kaz failed either to object or to seek any correcting instruction, and thus has forfeited its objection on this ground.  "[C]ounsel's objections to improper closing argument [are] untimely where the attorney had the opportunity but failed to raise objections outside the presence of the jury, at the time of argument, and at a sidebar conference immediately following the argument."  *Wilson v. Town of Mendon*, 294 F.3d 1, 16 n.30 (1st Cir. 2002), citing *Computer Sys. Eng'g, Inc. v. Qantel Corp.*, 740 F.2d 59, 69 (1st Cir. 1984).

Kaz's request for a new trial is heedless to the policy behind obligatory objections. A timely objection can nip practically any perceived prejudice in the bud.  In civil cases, as in criminal, public policy considerations demand that a party speak up *at the time*:

> If an error is not properly preserved, appellate-court authority to remedy the error (by reversing the judgment, for example, or ordering a new trial) is strictly circumscribed. There is good reason for this; "anyone familiar with the work of courts understands that errors are a constant in the trial process, that most do not much matter, and that a reflexive inclination by appellate courts to reverse because of unpreserved error would be fatal."
>
> This limitation on appellate-court authority serves to induce the timely raising of claims and objections, which gives the district court the opportunity to consider and resolve them. That court is ordinarily in the best position to determine the relevant facts and adjudicate the dispute. . . . And of course the contemporaneous-objection rule prevents a litigant from "sandbagging" the court—remaining silent about his objection and belatedly raising the error only if the case does not conclude in his favor.

*Puckett v. United States,* 556 U.S. 129, 134 (2009) (cites omitted). Similarly, *Fonten Corp. v. Ocean Spray Cranberries, Inc.,* 469 F.3d 18, 21-22 (1st Cir. 2006), citing *Wildman v. Lerner Stores Corp.,* 771 F.2d 605, 610 (1st Cir.1985) ("Counsel cannot play a waiting game and after an adverse verdict is rendered raise an objection to argument for the first time.").

If Kaz believed that any portion of Exergen's closing was prejudicial, it was duty-bound to give the Court an opportunity to cure the perceived harm at the time.

### 3.  Counsel made appropriate comments about  the construction of "peak" and "lateral scanning"

Repeating an issue from its motion for JMOL for noninfringement, Kaz's sole objection to Exergen's closing statement regarding "peak" is that counsel *correctly* summarized the testimony of Dr. Collins regarding the "peak" limitation.  Brief at 9.  As set forth in Exergen's opposition to that motion, there was substantial evidence to support the jury's determination that the "peak" limitation was met, both because Kaz's "averaging" evidence could have been

disregarded by the jury as unreliable, and because even with averaging, the "peak" limitation was met.

Kaz's objection to Exergen's closing statement regarding "laterally scanning," as with "internal body temperature," misreads what counsel said. Brief at 10.  Rather than suggesting to the jury that the only reason the limitation was met was the portion of the scan "over the eyebrow," counsel instead mentioned several things to the jury, including whether "what you saw was generally horizontal," "whether it contains within it a portion that is generally horizontal over the eyebrow," a reminder to compare the infringement with the claim, not Exergen's product, a reminder that "generally horizontal" is not the same as "straight across," and a reminder to take into account the fact that users of the Kaz thermometers scan it across the temporal artery.  TT 9:45-46.  At no point did counsel suggest that only because there may be a horizontal portion over the eyebrow--where the scan undoubtedly goes--the jury should decide solely on that basis.

Moreover, the Kaz product manuals speak for themselves in illustrating a generally horizontal motion for users to follow:



2 Scan

Move hair away from forehead and place scanner in the center of the forehead.

Press and release power button and scan forehead slowly from the center of the forehead to the temple - wait for confirmation beep.



Clear forehead of hair.
Place thermometer above eyebrow

Swipe the thermometer across forehead to temple and back

Excerpts from TX-2 (Vicks user manual) and TX-211 (Braun product insert), left and right, respectively. The jury had ample evidence from which to find that swiping the detector generally

horizontally over the eyebrow and across the temporal artery as shown corresponds to the

construction "moving a scanning device in a generally horizontal direction relative to the human

body."

### 4. Exergen made fair arguments about the doctrine of equivalents and inducement

Kaz complains further about counsel's statements regarding "laterally scanning,"

claiming that Exergen argued infringement under the doctrine of equivalents. Brief at 10-11. As

discussed above, a number of factors were identified for the jury to determine whether the scan

was generally horizontal. It is certainly proper for the jury to consider the meaning of "generally

horizontal" in the context of the patented technology—the direction by which to cross the

temporal artery to obtain a useful surface temperature. In any event, the doctrine of equivalents

was not mentioned in the closing until counsel raised the claim language "across a forehead." TT

9-46. Kaz has not identified any plain error to which to belatedly object.

Kaz rehashes the indirect noninfringement argument it also makes in its motion for

JMOL for noninfringement. Brief at 11. As explained in Exergen's opposition to that motion,

substantial evidence, including the opinions that Kaz relied upon at trial to show its alleged good

faith, supported a finding that Kaz either knew it infringed or was willfully blind to infringement.

In effect, Kaz complains that Exergen's counsel suggested one interpretation of the totality of the

circumstances, contrary to an interpretation that Kaz now puts forth but never shared with the

jury. Remarkably, Kaz complains (a) that Exergen should not have argued the opinions were

deficient, although Kaz itself did not bother to address those deficiencies at trial; (b) that

Exergen's counsel failed to mention in its closing certain evidence supposedly favorable to Kaz,

which Kaz itself failed to do at trial; and (c) that Exergen suggested a different interpretation of

Kaz's refusal to spend more money to do a proper job on its attorney opinions than the interpretation Kaz might have proposed but which, again, it did not bother to suggest to the jury.

It was Kaz's job, not Exergen's, to suggest a reasonable interpretation of the evidence favorable to Kaz.  Exergen's statements are not errors or mischaracterizations; they are suggestions of reasonable inferences that the jury might draw from the facts, as the jury finds them.

In a similar vein, Kaz complains that Exergen's counsel took Kaz to task for promising "new" art, and suggested that the jury look at the promise carefully.  Brief at 13.  Again, there is nothing wrong with this, and Kaz does nothing more than reargue the evidence now, too late for the jury's consideration.

In none of these instances did Kaz raise an objection at trial, thus bringing on itself the legal consequence of being silent when speaking up was required. That consequence is the application of plain-error review, an exacting standard of error that succeeds only in "extreme cases." *Matton v. White Mountain Cable Constr. Corp.*, 190 F.R.D. 21, 23 (D. Mass. 1999).  See also *Wells Real Estate, Inc. v. Greater Lowell Board of Realtors*, 850 F.2d 803, 809-810 (1st Cir. 1988) (adopting commentators' view that the "plain error" exception should be confined to circumstances where "the error has seriously affected the fairness, integrity, or public reputation of judicial proceedings").

Even when a party does make a timely objection, a new trial is rarely granted, especially where, as here, the material that the movant belatedly calls out "was a small and unrepeated part of a fairly lengthy summation" and the judge "instructed the jury that counsels' statements in closing argument are not evidence, an instruction that can often lessen any potential harm." *Rodriguez v. Senor Frog's de la Isla, Inc.,* 642 F.3d 28, 39 (1st Cir. 2011).  In this case, of

course, Kaz (and Exergen) had the benefit of just such an instruction[1], such that Kaz's

objections, even if they had been made at trial, would not support a new trial.

### B.      Kaz Makes an Absurd Effort to Pin Prejudicial Comments on the Court

Kaz contends that the Court made two prejudicial comments that warrant a new trial.

The first related to a standard for finding indirect infringement.  The second was a supposed

comment on the importance of an item of evidence, a poster-board.  Kaz concedes that it made

no objection at the time to either of the Court's utterances. Brief at 16-17 (acknowledging that

Kaz's current objection to "indirect infringement" comment is subject to plain-error review) and

21 (no suggestion that objection to poster-board comment was made at trial).  The argument

borders on the frivolous, as the comments did not even remotely impair the integrity of the trial.

### 1.      The jury's understanding of indirect infringement could not have been impaired by a statement of the Court, which was corrected in writing

The jury instructions on indirect infringement, including inducement and contributory

infringement, were extensive and unequivocal:

> In addition to direct infringement, Exergen also alleges that Kaz is liable
> for inducing users of its accused forehead thermometers to infringe
> method claims 7, 14, and 17 of the '685 patent, and 17, 24, 33, 60, and 66
> of the '938 patent. To prove this allegation, Exergen must establish that it
> is more likely than not: That users of the accused forehead thermometers
> actually carried out acts that directly infringed at least one patent claim;
> that Kaz aided, instructed, or otherwise took action intending to cause the

---

[1] This Court instructed the jury as follows:

Certain things are not evidence and should not influence your verdict. *Arguments and statements by the lawyers, as I have cautioned several times, are not evidence*. What the lawyers have said over the course of the trial you may find helpful, even persuasive, in reaching a verdict, but the facts are to be determined from your own evaluation of the testimony of the witnesses, the exhibits, and any reasonable inferences that you choose to draw from the facts as you find them.

TT 9:69-70 (emphasis added).

infringing acts by these users of the forehead thermometers; that Kaz knew of the patent at issue; *and that Kaz either knew of the infringement or it believed there was a high likelihood of infringement and nonetheless took deliberate steps to look the other way to avoid learning about it.*

Exergen also asserts that Kaz has contributed to infringement by others of the method claims. To establish contributory infringement, Exergen must prove that each of the following is more likely true than not: That Kaz's end-users have directly infringed the claim by using the accused thermometers; that Kaz has sold, offered for sale, or imported the accused thermometers within the United States; that the accused thermometers have no substantial non-infringing uses; that the accused thermometers constitute a material part of the claimed invention; *and that Kaz either knew that the thermometers were made or adapted for use in a manner that constitutes direct infringement of the claim; or again, that it believed that there was a high likelihood that this was true and nonetheless took deliberate steps to look the other way to avoid learning about it.*

TT 9:79-80 (emphasis added).

The instruction as to the requirement of knowledge or deliberate avoidance of knowledge had been anticipated in the closing arguments. Mr. Yanney explained, "Now, Kaz also cannot be held liable for indirect infringement unless Exergen proves to you that Kaz knew or was willfully blind to the fact that these thermometers might infringe." TT 9:28. And Mr. Timbers said, "So now we get to this issue of belief. It's an important one. Did Kaz believe that it infringed or did Kaz know that they had a high likelihood of infringement and they took deliberate steps to ignore it, to not know, right?" TT 9:48. Thus, the requirements to prove knowledge or deliberate avoidance of knowledge were made clear to the jury by the lawyers in closing and the Court in its instructions.

Discussing Kaz's reliance on opinions in his closing, Mr. Yanney went on to argue "they've always believed that these patents, apart from having a non-infringement argument, that there were problems with the patents that made them invalid." TT 9:6. To rectifythis improper attempt to assert the infringer's belief regarding validity as a defense to indirect infringement,

14

Exergen's counsel requested the Court to provide the jury an instruction that Kaz's belief as to invalidity is not a defense to indirect infringement.  As Kaz points out, the Court addressed the jury after the sidebar conference following the giving of instructions.  The Court referred back to "[w]hen I told you that a person can infringe even though it believes in good faith *that what it is doing is not infringing, that the patent is invalid*, that would apply to both direct and indirect infringement."  TT 9:95 (emphasis added).

While the italicized clause seems to treat an accused infringer's belief in noninfringement and its belief in invalidity alike, the Court promptly set the matter right. Soon after deliberations began, the Court sent a handwritten note, along with clarified instructions, to the jury, clarifying that it is only a party's belief as to *invalidity* that provides no defense to indirect infringement. The clerk handed a copy of the note to counsel for each party.  See Declaration of Sharona H. Sternberg in Support of Exergen's Opposition to Kaz's Motion for New Trial, submitted herewith, at ¶ 2.

Specifically, the Court pointed the jury to "[t]he sentence I inadvertently omitted regarding indirect infringement and good faith belief in the invalidity of a patent."  On an attached page, the Court added the following sentence to a page of instructions previously given (and read aloud) to the jury: "Belief as to the invalidity of a patent is no defense to indirect infringement."  See Exhibit A to Sternberg declaration. This sentence dispelled any misimpressions that may have lingered.

Considering the context, it is evident that Kaz has taken the Court's isolated statement regarding good faith out of all proportion.  Kaz's disingenuous protests come nowhere close to requiring a new trial for at least these reasons:

a.      Kaz tries to excuse its characteristic failure to object by arguing that the Court's "misstatement" did not appear in the written instructions that the Court provided to the parties before the charge conference, thereby leaving Kaz with no opportunity to object.  Kaz adds that "there was simply no time to process and issue an objection." Brief at 16.  It is not plausible that counsel--after carefully attending to every witness utterance for eight days in order to lodge an objection, if deemed appropriate--would drop their guard during the Court's brief supplemental instruction to the jury.  Or that, if counsel did drop its guard, they would cite this lapse as extenuating.

b.      Since Kaz had the opportunity to object—it simply did not seize it—Kaz cannot seek relief based on the supposed misstatement.  Rule 51 is interpreted strictly.  "We enforce our object-or-forfeit rule to compel the litigants to afford the trial court an opportunity to cure a defective instruction and to prevent litigants from ensuring a new trial in the event of an adverse verdict by covertly relying on the error." *Baron v. Suffolk County Sheriff's Dep't,* 402 F.3d 225, 235 (1st Cir. 2005) (internal quotation and citation omitted).  *Cambridge Plating Co. v. Napco, Inc.*, 85 F.3d 752, 767 (1st Cir. 1996). "[T]he plain error standard, high in any event, ... is near its zenith in the Rule 51 milieu." *Clausen v. Sea-3, Inc.*, 21 F.3d 1181, 1196 (1st Cir. 1994) (internal quotations omitted)).

c.      Kaz's motion for a new trial based on the Court's comment on indirect infringement does not come within hailing distance of "plain error."

> To obtain relief under this standard, the party claiming error must show (1) an error, (2) that is plain (i.e., obvious and clear under current law), (3) that is likely to alter the outcome, and (4) that is sufficiently fundamental to threaten the fairness or integrity or public reputation of the judicial process. The requirement that the error is likely to alter the outcome is particularly important in this context because [a]n erroneous jury instruction necessitates a new trial only if the error could have affected the result of the jury's deliberations.

16

*Colon-Millin v. Sears Roebuck de Puerto Rico, Inc.*, 455 F.3d 30, 41 (1st Cir. 2006) (internal

quotations and citations omitted). Here, even if there had been "an error" in the initial comment,

the Court promptly cured it with a written supplementary instruction.  Moreover, there is no

reason to suspect the isolated comment impaired the jury's understanding of the requirements for

indirect infringement as set out in detail by the Court and reinforced by the attorneys. The weight

of Kaz's burden is evident when one considers the premise that a court need not provide a

faultless instruction to a jury.  *Collins v. Ex-Cell-O Materials and Handling Co.,* 629 F. Supp.

540, 543 (D. Mass. 1986) (stating that "[t]he question on this motion for a new trial is whether

there is a reasonable risk of a miscarriage of justice, "not whether an instruction was faultless in

every respect"). Not only did the Court give an accurate instruction in writing, but the jury, in

any event, had abundant evidence on which to base its finding that Kaz induced and contributed

to the infringement of the asserted patent claims.

d.      Kaz twice stresses that the Court's "inadvertent slip of the tongue" was particularly

injurious because it was the last thing the jury heard before retiring.  Brief at 16 and 18.  It is

brazen for Kaz to make this argument and then neglect to note that the Court sent a corrective

instruction to the jury. In a remarkably similar situation, where a "curative instruction was given

after the jury began its deliberations," the First Circuit upheld the denial of a new trial because

"the instruction received special emphasis because it was in writing and was separate from the

other jury instructions. We are not disposed to conclude that a jury will not follow a curative

instruction." *S.E.C. v. Happ,* 392 F.3d 12, 27 (1st Cir. 2004) (belated instruction cured "real and

serious" misstatement by SEC's counsel). Here, similarly, the Court's curative instruction—

which Kaz fails to mention—likely made a stronger impression on the jury under the

circumstances. Further, the Court's supposed misstatement was made only orally, while the

curative instruction was handed to the jury in writing, with attention drawn to the key sentence

by the Court's handwritten note.

### 2.    No conceivable harm resulted from the Court's comment upon admitting a poster into evidence

After Dr. Pompei drew an equation on a poster board relating to the role of arterial heat

balance in the DermaTemp device, Exergen asked that the poster be admitted into evidence.  Kaz

stoops to the picayune in complaining that the Court okayed the poster's admission with the

comment: "Since it's been such a critical part of the testimony, yes."  Brief at 21, citing TT-4:55.

Kaz misrepresents the comment to "signal to the jury that Dr. Pompei's calculations were

"critical" and accurate.  *Id.*  In fact, the Court never said that the calculations were "critical,"

suggesting only that the poster was an integral part of Dr. Pompei's testimony.

Putting aside the utter triviality of Kaz's objection, it is certain that Kaz forfeited it by not

raising it at the time.  At the very least, since the parties were receiving daily transcripts of the

proceedings, Kaz could have raised an objection the following day or sought a curative

instruction at the charge conference.  As laid out above, the law requires Kaz to give the Court an

opportunity to mitigate any prejudice that Kaz believed the comment caused.

Even if the Court's comment can be construed to endorse Dr. Pompei's calculations,

there is no ground for objection.  "It is well settled that a federal district judge may explain and

comment upon the evidence to draw the attention of the jury to those parts which the court thinks

important."  *Doherty v. Doherty Ins. Agency, Inc.*, 878 F.2d 546, 553 (1st Cir. 1989) (during

instructions, the judge had permissibly elevated the significance of certain evidence over other

evidence), citing *Quercia v. United States,* 289 U.S. 466, 469 (1933) ("It is within his province,

whenever he thinks it necessary, to . . . express his opinion upon the facts, provided he makes it

clear to the jury that all matters of fact are submitted to their determination.").  Similarly,

*Leshore v. Cty. of Worcester,* 945 F.2d 471, 474 (1st Cir. 1991) ("the district court followed the longstanding principle that a trial judge is not limited to instructions in the abstract, but may explain and comment on the evidence, and point out for the jury important portions thereof").

It goes without saying that the Court's comment of which Kaz complains is far more innocuous than the overall commentary on the evidence—in the course of instructions themselves--that the Supreme Court and First Circuit held to be within a district judge's "province."  Moreover, this Court repeatedly told the jurors that they alone were to find the facts, saying, among other things:  "You will, when I'm finished, be surprised--even astonished–at the extent to which the law commits this case to your sole determination as the judges of the facts." TT-9:67.

### C.      The Plentiful Evidence of Non-Obviousness Argues Against a New Trial

The jury had a rock-solid basis for finding that Kaz had not proven any of Exergen's asserted claims obvious. The objective indicia of non-obviousness that Kaz says were not proven at trial (Brief at 19) were in fact the subject of ample testimony.  Kaz has no call for a new trial.

As more fully discussed in Exergen's opposition to Kaz's renewed motion for JMOL of obviousness, "if the marketed product embodies the claim features, and is coextensive with them, then a nexus is presumed and the burden shifts to the party asserting obviousness to present evidence to rebut the presumed nexus.  The presumed evidence cannot be rebutted with mere argument; evidence must be put forth."  *Brown & Williamson Tobacco Corp. v. Philip Morris Inc.*, 229 F.3d 1120, 1130 (Fed. Cir. 2000).

At trial, Dr. Pompei testified that Exergen's temporal artery thermometer (TAT) products are covered by the asserted claims, and in fact Exergen marks its products with the patents for this very reason. TT-2:48-49.  Dr. Pompei discussed and demonstrated how Exergen's TAT products work. Additionally, he walked the jury through representative claims from each patent,

claim 14 from the '685 patent and claim 39 of the '938 patent, and explained how the TAT embodies each of the elements, which are common to many of the asserted claims. TT-2:49-51. The jury was entitled to credit Dr. Pompei's testimony as the inventor of the patents and TAT products, especially because it went entirely unchallenged by Kaz during cross-examination.

In fact, the Court already ruled on this issue when denying Kaz's motion in limine seeking to bar Exergen from presenting trial testimony on secondary considerations, holding that "Kaz may cross-examine and argue to the jury that Exergen's proposed evidence of obviousness – long felt need, and skepticism, and praise etc.–were not directed to the patented features, and the jury may draw its own conclusion on the weight to accord such evidence." DN 343.

The jury heard testimony on the following topics about Exergen's TAT, which is covered by the patents in suit: Its commercial success, the long-felt need for such a device, industry skepticism that it would work, unexpectedly superior results, requests to license the patents, and, of course, copying. Dr. Pompei explained the benefits of the patented invention: "The Exergen Temporal Scanner was the first to demonstrate, you know, the clinical accuracy for a forehead thermometer." TT-3:47. Both Dr. Pompei and Dr. Collins explained the limitations of the numerous other types of thermometers, that doctors had desired an alternative that overcame them, and that the TAT represented this alternative.

The jury also heard that Dr. Pompei's invention went contrary to accepted wisdom in the field, which actually taught away from the invention. Exergen offered evidence that the medical industry was highly skeptical that the forehead device could work. Dr. Marybeth Pompei testified to the time and resources Exergen spent to establish the TAT's credibility with doctors. TT 4:68-81. The great commercial success of the Exergen device was spelled out in detail by both Dr. Marybeth Pompei and Exergen's damages expert, Mr. Sussman. *Id.* at 76-77. Mr.

20

Sussman pointed the jury to various Kaz documents that demonstrated that the patented features – *e.g.*, "passing a thermometer across the forehead" – were the reason for customer demand.  TT 7:108.  Kaz tried to trick Mr. Sussman and the jury into believing that consumers might prefer Exergen's device over Kaz's simply because the TAT packaging advertises the "patented arterial heat balance method."  Brief at 19.  Here, the term "patented", of course, refers to Exergen's prior art '813 patent which introduced the arterial heat balance method.  Mr. Sussman stood his ground and correctly responded that consumers may not recognize the term "arterial heat balance method" on Exergen's packaging, but that they buy Exergen's device because of the key feature of the thermometer– swiping over the forehead–which is explicitly covered by the patents in suit. TT 8:10-14.

"Whether objective considerations support a conclusion of nonobviousness is a question of fact."  *Circuit Check Inc. v. QXQ Inc.*, 795 F.3d 1331, 1336 (Fed. Cir. 2015). "Because the jury rendered a general verdict that the claims were not obvious, [the Court] must presume that they found in favor of [patentee] on all relevant questions supported by substantial evidence." *Id.*

### D.      Kaz Has No Grounds for a New Trial on Damages

The determination of the amount of damages based on a reasonable royalty is an issue of fact, *Unisplay, S.A. v. Am. Elec. Sign Co.,* 69 F.3d 512, 517 (Fed. Cir. 1995), as is the calculation of lost profits. *Cal. Fed. Bank, FSB v. United States,* 245 F.3d 1342, 1350 (Fed.Cir.2001). Where, as here, Kaz seeks a new trial on the damages that the jury computed based on the evidence of the harm caused by Kaz's infringement, "the trial court determines whether the jury's verdict is against the clear or great weight of the evidence." *Unisplay*, 69 F.3d at 517. An award of damages will be set aside only "if it is so grossly disproportionate to any injury established by the evidence as to be unconscionable as a matter of law." *Koster v. Trans World Airlines, Inc.*,

21

181 F.3d 24, 34 (1st Cir.), *cert. denied,* 528 U.S. 1021 (1999).  This Court "must examine the

evidence in the light most favorable to the award, drawing all possible inferences in its favor."

*Smith v. Kmart Corp.*, 177 F.3d at 21,citing *Havinga v. Crowley Towing and Transp. Co.,* 24

F.3d 1480, 1483 (1st Cir. 1994).

     None of Kaz's reasons for a new trial measure up to these strict criteria:

     **1.**     **Exergen was not bound to apportion damages between the two asserted patents**

     Kaz observes that the hypothetical negotiation date (HND) for damages differed for each

patent, since, when Kaz began infringing in January 2009, only the '685 patent had issued.  By

contrast, the '938 patent did not issue until some 19 months later, in August 2010.  Kaz cites no

authority for the proposition that it is due a new trial on damages because Exergen posited only

one HND, January 2009.  To the contrary, where the plaintiff asserts more than one patent, there

is good authority, as Kaz notes, for positing the date of first infringement of the earliest-issued

patent as the HND.  This is because the parties are assumed to include later related patents in the

negotiated license. Brief at 17, citing *Comcast IP Holdings I, LLC v. Sprint Commc'ns Co. L.P,*

No. 12-CV-0205-RGA, 2015 WL 4730899, at *9 (D. Del. Aug. 10, 2015) ("hypothetical

negotiation in 2006 would include each of the asserted patents, even if they issued later").

     Kaz frets that, if the Court finds the asserted claims of the '685 patent invalid (but not

those of the '938), the January 2009 HND would have to be replaced with August 2010.  This is

idle speculation.  Significantly, Kaz's own damages expert did not opine that a different royalty

rate would apply in August 2010 from the rate which would have been negotiated in January

2009.  And at trial, Kaz never questioned Exergen's damages expert on his application of one

negotiated rate from January 2009 forward.  Indeed, both experts were bound to assume that

each patent was valid and infringed.  This is no doubt the reason no case law supports a new trial on damages when an expert follows this convention.

Even if Kaz had presented evidence at trial to support a different royalty rate for the '938 patent as of August 2010, it is immaterial that an August 2010 HND would have fallen after the Federal Circuit found that Wal-Mart did not infringe certain claims of the '685 patent.  Kaz suggests that this would have pushed Exergen toward accepting a lower royalty rate. This psychological profiling is unpersuasive where the negotiation "is constructed on hypothetical assumptions. Most basically, the method *assumes infringement* and validity of the patents and willingness of the parties to negotiate an agreement." *Aqua Shield v. Inter Pool Cover Team*, 774 F.3d 766, 771 (Fed. Cir. 2014) (emphasis added).

## 2.      Kaz is Wrong to Say the Award is Excessive

Kaz bemoans the jury's having tilted toward Exergen's damages calculation rather than its own. This is not enough to get a new trial.  "The jury was entitled to hear the expert testimony and decide for itself what to accept or reject." *i4i Limited Partnership, Infrastructure for Information Inc. v. Microsoft Corp.,* 598 F.3d 831, 856 (Fed.Cir.2010). "In setting damages, the jury's function is to weigh contradictory evidence, to judge the credibility of the witnesses, and to resolve factual disputes," *C & F Packing Co. v. IBP, Inc.,* 224 F.3d 1296, 1304 (Fed.Cir.2000), provided that the record does not "rest on faulty assumptions and a lack of reliable economic testimony." *Oiness v. Walgreen Co.,* 88 F.3d 1025, 1032 (Fed.Cir.1996).

Similarly, the First Circuit states that "the obstacles which stand in the path" of claims of excessiveness "are formidable ones." *Smith v. Kmart.,* 177 F.3d at 29, quoting *Wagenman v. Adams,* 829 F.2d 196, 215 (1st Cir. 1987). A jury award should not be disturbed only because "it is extremely generous or because we think the damages are considerably less." *Diefenbach v. Sheridan Transp.,* 229 F.3d 27, 32 (1st Cir. 2000), citing *Koster*, 181 F.3d at 24.

Kaz musters only misstatements of the record in support of a new damages trial. Kaz asserts that Exergen's damages expert acknowledged that, at the time of the HND in 2009, Kaz would not have agreed to a gross profit margin less than 30%. This is false. In fact, Mr. Sussman observed only that a Kaz planning document from 2008 defined a "successful product" as one having a 30% gross margin. TT 7:133. He went on to testify that, in a negotiation with "one of its arch competitors," Kaz would have a starting point that would yield less than 30%. *Id*. Mr. Sussman and previous witnesses had already provided abundant testimony about the fierce competition between the companies, about Exergen's substantial gross margins, and about Kaz's desire to break into the forehead part of the thermometer market. These factors, he testified, would justify Kaz's decision to pay a higher royalty. See, e.g., TT 7:137-139.

Kaz throws in the obviously ineffectual argument that "the only comparable license in evidence" was a 2006 license under which Kaz paid AMC a mere 5.7% royalty for technology related to Kaz's behind-the-ear thermometer. The absence of actual comparability of this license to the one hypothetically negotiated between Exergen and Kaz was made plain by Kaz's own damages expert. He acknowledged that (a) AMC was licensing only patent applications, no actual patents; (b) the behind-ear was an unknown quantity (that in fact went on to produce poor sales for Kaz), whereas Exergen's forehead thermometer had a multi-year record of growing success, and (c) the AMC license was not between competitors. TT 8:107-108.

Again, Kaz has not shown that the jury's award was contrary to the evidence. Indeed, Kaz's resort to small-scale attacks on the verdict which, for all that, are based on misstatements of the evidence, tends to show how well-supported the award was. Significantly, the jury's award of $14.6 million fell short of one of Mr. Sussman's damages scenarios. TT 7:141 (proposing a total of $15.5 million). The Federal Circuit has held that, where "the jury's choice

was within the range encompassed by the record as a whole . . ." and "ultimately the jury awarded lower total damages than [the patentee's expert] recommended," the accused infringer cannot show that "the verdict is bereft of a reasonable basis in the record."  *Finjan, Inc. v. Secure Computing Corp.,* 626 F.3d 1197, 1212 (Fed. Cir. 2010) (cites omitted) (affirming denial of motion for new trial on damages).

### 3.  Entire Market Value Rule (EMVR) Provides No Basis for Attack on the Award

Kaz casts doubt on whether the patented features drive customer demand and therefore argues that damages were improperly based on the entire market value of Kaz's infringing thermometers. The jury heard copious evidence, much of it derived from Kaz's own market research and consumer surveys, to the effect that location of the temperature-measurement site is the first decision a customer makes when deciding on a thermometer and the primary reason why a consumer would buy a Braun or Exergen forehead thermometer. Furthermore, most of the benefits cited by Kaz for its products (*e.g.*, noninvasive, gentle, fast, easy), are enabled by the patented technology.  See, *e.g*., TT 7:140.

As noted in Exergen's opposition to Kaz's motion in limine to exclude evidence of the EMVR [DN 333], Kaz can legitimately attack the use of EMVR only if its purpose is to challenge Mr. Sussman's inclusion in the damages base of the entirety of Kaz's revenue from the accused products.  It is not less than astonishing, therefore, to find that Kaz's expert, Mr. Barry, lines up foursquare behind Mr. Sussman's calculations.

By way of illustration, in Table 4 from Kaz's TX 262-004, Mr. Barry calculates "Kaz Sales Subject to Royalties" as $35.4 million, a figure he reaches by simply adding all of Kaz's revenue from 2009 forward.  See also TT 8:85.  He subtracts nothing on account of Kaz's concerns over whether all sales are attributable to the patented features.   By the same token, in

25

analyzing lost profits, Mr. Barry acknowledges that the entirety of the market value is the appropriate starting point, with deductions only for two categories of incremental costs. TX-262-003.

In this respect, too, he agrees with Mr. Sussman's view of the base. Mr. Barry makes no adjustment for unpatented features that should be apportioned to Kaz. To be sure, the two experts diverge sharply on the calculation of lost profits and reasonable royalties, but they agree that the starting point is the entire market value of the accused thermometers sold by Kaz. Kaz cannot be heard to complain that the damages base was calculated based on a rule that was embraced by both parties' damages experts equally.

### E. Kaz's Remaining Reasons for a New Trial Must be Rejected

Kaz briefly contends that a new trial should be ordered (a) on subject matter eligibility because the Court submitted no questions to the jury on the topic, and (b) due to the Court's not having read Kaz's proposed instructions or claim constructions to the jury.

The Court announced that it would submit no Section 101-related questions to the jury— as to whether patented elements were well-understood, routine or conventional--because no testimony was introduced on that topic. Kaz did not protest. TT 8:244-245. It is therefore bewildering that Kaz nonetheless says it "was entitled to have the jury receive instructions, and to make those § 101-related findings." Brief at 22. Kaz not only failed to object to the decision not to ask those questions; it did not deny that it introduced no evidence to warrant asking them.

Kaz likewise failed to object that the instructions that emerged from the charge conference were not identical to its proposed instructions. Indeed, after the Court read the instructions, Kaz affirmed that it was content with their rendering. TT 9:94. Kaz waived any objections regarding the instructions. *Wells Real Estate, Inc. v. Greater Lowell Board of Realtors,* 850 F.2d 803, 809 (1st Cir. 1988) (reviewing extensive precedential authority of waiver

under Rule 51 for failure to object to jury instructions after the charge is given to the jury). Once

a party has waived its objection under Rule 51, the instruction as provided to the jury becomes

the law of the case. *Id.* at 809.  As earlier noted, the purpose of the rule is to ensure that the Court

has an opportunity to address any problems with the charge before the jury retires.  *See, e.g.,*

*Smith,* 877 F.2d at 1110.

## IV.    CONCLUSION

Based on the foregoing reasons, Exergen asks that Kaz's motion be denied.


Date:  May 19, 2016                              Respectfully submitted,

                                                 EXERGEN CORPORATION

                                                 By its attorneys,

                                                 /s/ Kerry L. Timbers
                                                 Kerry L. Timbers (BBO # 552293)
                                                 Robert M. Asher (BBO # 22865)
                                                 Joel R. Leeman (BBO # 292070)
                                                 Brandon T. Scruggs (BBO # 672541)
                                                 Sharona H. Sternberg (BBO # 682384)
                                                 SUNSTEIN KANN MURPHY & TIMBERS LLP
                                                 125 Summer Street
                                                 Boston, MA 02110-1618
                                                 (617)  443-9292
                                                 ktimbers@sunsteinlaw.com


## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing on the above date.

                                                 /s/ Kerry L. Timbers
                                                 Kerry L. Timbers


3577/508 2506483.2

27